IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WAFA O., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 3455 |
| v. ) | |
| ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER[2]

Before the Court are Plaintiff Wafa O.'s[3] motion for summary judgment seeking remand of the final decision of the Commissioner denying her Disability Insurance Benefits ("DIB") (D.E. 19) and the Commissioner's cross-motion to affirm the decision. (D.E. 27.)

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On July 29, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 9.) On August 22, 2019, this case was reassigned to this Court for all proceedings. (D.E. 13.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

**BACKGROUND**

**I.  Procedural History**

Plaintiff applied for DIB in November 2015, alleging a disability onset date of January 1, 2013, when she was 53 years old. (R. 160.) Her date last insured ("DLI") was September 30, 2014.[4] (R. 17.) On December 20, 2017, Plaintiff received a hearing before an Administrative Law Judge ("ALJ") (R. 29), and on April 18, 2018, the ALJ issued a written opinion finding Plaintiff not disabled. (R. 12.) On March 20, 2019, the Appeals Council denied Plaintiff's request for review (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

**II.  Administrative Record**[5]

In October 2012, less than three months prior to her alleged onset date, Plaintiff underwent arthroscopic surgery on her right knee (debridement of the medial meniscus (removal of degenerative tearing in cartilage on inner side of knee)). (R. 324.) That month, Plaintiff also underwent left carpal tunnel release surgery, and in November, a physician noted Plaintiff also had tingling, numbness and pain in her right hand. (R. 323.) In December 2012, Plaintiff reported increased right knee pain and had a minimally antalgic gait, mild tenderness and mild to moderate swelling, but overall good range of motion ("ROM"). (R. 320.)

In July 2013, after complaining of chronic left knee pain and the inability to bend her knee, Plaintiff underwent x-rays of both knees, which showed degenerative joint space narrowing. (R. 306.) Plaintiff continued to complain to her doctors of pain in both knees in August 2013. (R. 268.)

---

[4] To obtain DIB, a claimant must establish that he or she became disabled before their date last insured. *Kaplarevic v. Saul*, 3 F.4th 940, 942 (7th Cir. 2021).

[5] As Plaintiff does not argue that the ALJ erred in determining that her alleged mental impairment was not severe, the Court addresses only Plaintiff's alleged physical impairments.

On April 30, 2014, Plaintiff met with rheumatologist Rediet Kokebie, M.D., to address her complaints of joint pain in her shoulders, knees, neck and hands, including continued pain and stiffness in her right knee even after surgery and a steroid injection. (R. 1012.) On examination, Plaintiff exhibited crepitus (grating sound) and full ROM in both knees. (R. 1013.) She was diagnosed with generalized osteoarthritis and prescribed Cymbalta.[6] (*Id*.) X-rays showed Plaintiff had joint space narrowing in her knees, worse on the right, and medial subluxation of the right distal femur (dislocation of the bone just above the knee joint). (*Id*.)

On June 11, 2014, Dr. Kokebie gave Plaintiff steroid injections to address her bilateral knee pain, despite minimal relief with injections in the past. (R. 1011.) On August 6, she returned to Dr. Kokebie, complaining of continued hand, wrist and bilateral knee pain. (R. 1010.) Medicaid did not approve Cymbalta, so Dr. Kokebie prescribed hydroxychloroquine ("HCQ"),[7] topical analgesics and oxaprozin.[8] (*Id*.) Examination again showed crepitus and full ROM. (*Id.*) On September 10, Plaintiff told Dr. Kokebie she continued to have significant bilateral knee pain. (R. 1008.) Dr. Kokebie referred her for an MRI of her knees and continued to prescribe HCQ because NSAIDs (non-steroidal anti-inflammatory drugs) upset Plaintiff's stomach.[9] (*Id*.)

---

[6] Cymbalta is used to treat depression as well as ongoing bone or muscle pain from osteoarthritis. https://medlineplus.gov/druginfo/meds/a604030.html.

[7] Hydroxychloroquine is an antimalarial drug that can be used to treat rheumatoid arthritis in patients whose symptoms have not improved with other treatments. https://medlineplus.gov/druginfo/meds/a601240.html.

[8] "Oxaprozin is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints)." https://medlineplus.gov/druginfo/meds/a693002.html.

[9] NSAIDs are "a common treatment for chronic (long-term) health problems, such as arthritis (rheumatoid arthritis, osteoarthritis, and others) and lupus." https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Treatments/NSAIDs.

On September 24, 2014, Plaintiff met with orthopedic surgeon Craig McAsey, M.D. She reported having no relief from knee pain despite surgery, and minimal relief from physical therapy ("PT"), but Aleve gave her some relief; she rated her pain that day as a five out of 10 (R. 453.) On examination, she had full ROM and motor strength, but displayed an antalgic gait favoring both lower extremities, medial pseudolaxity (laxity in the knee joint from loss of cartilage) and tenderness in the medial joint and patellofemoral joint (front of knee). (*Id.*) Dr. McAsey wrote that radiographs from that day showed Plaintiff had osteoarthritis "bordering on grade 3" (on a four-point scale, with four being the most severe), bone spurs, approximately 50% cartilage loss in the medial joint space, and subchondral sclerosis (thickening of bone) with subluxation (partial dislocation) in both knees. (*Id.*) He advised Plaintiff to obtain a repeat set of injections "to confirm that her knee is the sole source of her pain [as] she also does have some outside complaints of radicular symptoms into the feet bilaterally." (R. 454.) Dr. McAsey prescribed Arthrotec (NSAID used to relieve pain and swelling). (*Id.*)

Plaintiff attended PT on September 15 and 22, 2014, reporting increased left knee pain, and on September 29, she reported pain shooting up from her feet to her buttocks at night. (R. 368.) At PT on October 1 and 6, just after her September 30 DLI, Plaintiff reported that she continued to have shooting pain. (*Id.*) The therapist noted she had limited knee flexion and extension, tenderness to palpation and crepitus bilaterally, and wrote that Plaintiff showed "mild improvement in bilateral knee pain through 6 therapy sessions." (*Id.*)

On October 6, 2014, Plaintiff met with internal medicine physician Kevin Polsley, M.D. (R. 368-69.) She reported that taking Arthrotec was "helping a little, but she was also having 'problems with dropping things,'" where "all of a sudden [she felt] weak." (R. 369-70.) On October 13, Plaintiff told her physical therapist that she had canceled her last appointment because her

4

knees were too painful; she was having difficulty walking and standing. (R. 368.) At PT on October 15, Plaintiff rated her bilateral knee pain as a seven out of 10; although she reported "improved" bilateral knee pain after her PT session, her knee pain was still at a level of six to seven out of 10 at her next appointment on October 20, and she reported difficulty walking and standing on her right leg. (R. 362.) On October 22, Dr. McAsey found Plaintiff's physical examination unchanged from her last visit and injected both of her knees with a corticosteroid. (R. 422.)

On November 20, 2014, Plaintiff followed up with Dr. Polsley and reported hand pain, leg pain, head pain, numbness and tingling. (R. 349-50.) Dr. Polsley noted Plaintiff walked with a limp. (R. 350.) On December 10, Plaintiff told Dr. Kokebie she was "doing a little better" after the knee injections. (R. 1007.) Dr. Kokebie prescribed topical analgesics for Plaintiff's hand pain and acupuncture and medical massage for her other aches and pains. (*Id*.)

On January 16, 2015, Plaintiff met with internal medicine physician Sara Doss, M.D., complaining of constant fatigue and pain in her legs from hips to feet, as well as headaches and tingling in her toes. (R. 344-45.) Plaintiff was very depressed, so Dr. Doss increased her dose of antidepressants. (*Id*.) On January 30, Plaintiff had an initial consultation with neurologist Marisa McGinley, M.D., to whom she described head pressure and balance problems, including dropping things and wobbling when she walked, as well as chronic knee and neck pain that radiated down her arms and legs. (R. 3053.) Dr. McGinley wrote that Plaintiff's neurological exam was "remarkable for mild sensory deficits in her fingertips and great toes, along with instability with Romberg [balance test], but was otherwise [normal]." (R. 3056.). Dr. McGinley prescribed migraine medication and opined that the "[e]tiology of unsteadiness/dropping things [was] less clear at [that] time, but include[d] orthopedics problems (ex knee pain) combined with previous carpal tunnel [was] most likely, but [] underlying cervical disc disease [was] also possible." (*Id*.)

5

On February 13, 2015, an MRI of Plaintiff's spine showed moderate to severe neural foraminal stenosis (compression/narrowing of the spaces) of the lumbar spine (lower back) at the L5-S1 level and severe central spinal stenosis and cord deformity in the cervical spine (neck) at the C5-C6 level. (R. 503-05.) On February 16, Dr. Doss prescribed Flexeril (muscle relaxant) and Norco as needed for pain and told Plaintiff to restart diclofenac (topical gel to relieve arthritis pain). (R. 389.) On February 23, Plaintiff met with neurosurgeon Beejal Amin, M.D.; he recommended anterior cervical discectomy and fusion ("ACDF") surgery (removal of damaged portion of discs and fusion together of the vertebrae) at the C5-6 level. (R. 492-94.) On May 4, Plaintiff met with neurosurgeon Ricardo Fontes, M.D., who agreed that "fusion would be the only reasonable surgical option" for Plaintiff's cervical and lumbar problems; he prescribed PT and gabapentin (pain reliever, anticonvulsant) for pain. (R. 2050-53.) On May 27, Plaintiff told pain management specialist Reem Bitar, M.D., that her knee, wrist and neck pain were at a nine out of 10. (R. 2041.) Dr. Bitar observed Plaintiff had full ROM but walked with a limp; he advised her to have neck surgery as soon as possible and prescribed Norco, gabapentin and Naproxen (NSAID). (R. 2042.) On June 18, neurologist Herbert Engelhard III, M.D., performed ACDF surgery at the C5-6 level of Plaintiff's neck. (R. 2723.)

On June 8, 2015, x-rays of Plaintiff's knees showed severe narrowing on the right and "almost" severe issues on the left (R. 2733-34), and she rated her pain at a 10 out of 10. (R. 2777.) Orthopedic surgeon Bruce Dolitsky, M.D., performed total knee replacement of Plaintiff's left knee on August 25 (R. 1825-26) and of Plaintiff's right knee on November 24. (R. 540, 557.)

In March 2016, a non-examining state agency reviewing physician opined that despite having severe major joint dysfunction and unspecified arthropathies, Plaintiff could perform medium work with frequent pushing and pulling before her DLI of September 30, 2014. (R. 94-

6

97.) On reconsideration, another non-examining state agency doctor opined Plaintiff was limited to light work before her DLI. (R. 85-86.)

### III. Evidentiary Hearing Before the ALJ

On December 20, 2017, Plaintiff testified at a hearing that she had stopped working as a hairdresser in 2013 due to pain in her hands and knees. (R. 45.) In 2013 and 2014, she was able to cook and clean around the house, but those activities took her a long time because she had to stop periodically to rest to ease the pain in her neck, hands, back and knees. (R. 51-53, 56-57.) Her trips to the grocery store at the time were limited because she would leave when her legs started hurting or became wobbly. (R. 58.) In 2017, she traveled overseas for the first time since 1995. (R. 56.) The vocational expert testified that Plaintiff's work as a hair stylist involved frequent to constant handling, fingering and standing, and that being off task more than 10 to 12 percent of the workday would be work preclusive. (R. 70-73.)

### IV. ALJ's Decision

On April 18, 2018, the ALJ issued a written opinion finding Plaintiff was not disabled within the meaning of the Social Security Act from her alleged onset date of January 1, 2013 through her DLI of September 30, 2014. (R. 15.) The ALJ found that through her DLI, Plaintiff had the severe impairments of "dysfunction – major joints and other [] unspecified arthropathies." (R. 17.) The ALJ recognized that Plaintiff underwent carpal tunnel release surgery but noted that an electromyography of her upper extremities was normal. (R. 18, citing R. 1301 (June 2017 EMG).) The ALJ also acknowledged Plaintiff underwent back and neck surgery but found "the medical records documented no functional limitations from her past surgery." (R. 18, citing R. 1376 and 1380 (November 2016 lumbar surgery at L5).) The ALJ concluded that Plaintiff's impairments alone or in combination did not meet or medically equal the severity of a listing,

finding that Plaintiff could ambulate and perform fine and gross movements "effectively." (R. 18-19.) The ALJ assigned Plaintiff a residual functional capacity ("RFC") (through her DLI) to perform light work with frequent operation of foot controls, handling and fingering; occasional climbing of ramps/stairs, kneeling, crouching or crawling; and never climbing ladders, ropes, or scaffolds. (R. 19.) The ALJ allowed for Plaintiff to be off task 10% of the day. (*Id*.)

The ALJ found it "notabl[e]" that "there are no medical records from the alleged onset date thru June 2013," but acknowledged that in July 2013 knee x-rays showed degenerative joint space narrowing, in April 2014 Dr. Kokebie diagnosed Plaintiff with osteoarthritis, and in June 2014 Plaintiff received steroid injections. (R. 20.) The ALJ also recognized that Plaintiff reported pain in her shoulder, neck, hands and knees from April through September 2014, but emphasized that physical examinations "showed crepitus but full range of motion of all joints." (*Id*.) The ALJ next reviewed the post-DLI record, noting that Plaintiff presented to Dr. McGinley with a "normal" examination showing full strength and normal reflexes in her extremities. (*Id*.)

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were "not supported by the medical records," and that the state agency opinion limiting Plaintiff to light work was entitled to "great weight since it is supported by the medical records." (R. 21-22.)[10] In support of these conclusions, the ALJ stated:

- A September 2014 report showed Plaintiff had full weight bearing bilaterally with no use of an assistive device. (R. 21, citing to Exhibit 29F (R. 3060-74), a December 2017 post-operative report on surgery to Plaintiff's left little and middle fingers.)

- Plaintiff "report[ed] no high level pain," because she rated her pain as two to six on a 10 point scale. (R. 21, citing to Exhibit 29F (the December 2017 report).)

---

[10] The ALJ gave "little weight" to the RFC opinion of a physical therapist who treated Plaintiff in 2017, as it was "not supported by the record as a whole" and physical therapists are not acceptable medical sources under the Social Security regulations. (R. 22, citing R. 974-78.) The ALJ stated that Plaintiff had not been "totally compliant" with PT in 2017 (R. 22), but the Court notes that July 2017 PT notes indicate Plaintiff cancelled "because she is in such horrible pain and is waiting to see her primary care." (R. 992-94.)

- Plaintiff "had not even seen a neurologist or rheumatologist" before her DLI and a neurological examination a few months after the DLI "indicates that she could likely do light work." (R. 21.)

- "[I]n October 2014, she reported significant improvement in bilateral knee pain with injections. She reported walking with much less pain. In December 2014, she also reported that she felt a little better after a recent shot." (R. 22.) (The ALJ gave no citation to the record for these statements.)

- "[A]t the hearing, [Plaintiff] popped up out of her chair before we even started," and she "reported that she took a trip recently to the Middle East." (R. 21-22.)

- "The claimant has purported performing a good range of activities of daily living. In a function report, she reported that she did laundry, dishes, and housework." (R. 22, citing R. 213.)

Furthermore, the ALJ highlighted that although Plaintiff started to complain about dropping things near her DLI, "there [was] no new diagnosis at that point," and an "MRI of the cervical spine does show some issues, but there was no EMG at that point." (R. 21-22.) Ultimately, the ALJ found that through her DLI, Plaintiff was capable of performing her past relevant work as a hairdresser, both as actually (light to medium level) and generally (light level) performed. (R. 23.)

## ANALYSIS

Plaintiff argues that the Court should reverse and remand the ALJ's decision because it was not supported by substantial evidence. The Court agrees.

I.  **Legal Standard**

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. . . . [T]he threshold for such evidentiary sufficiency is not high." *Id*. In making this determination, the Court may "not reweigh

9

the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

**II.     The ALJ's Decision Was Based on Factual Errors**

As an initial matter, it is axiomatic that an ALJ decision that is based on "serious factual mistakes" or "a blatant factual error" is not supported by substantial evidence. *See Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806-07 (7th Cir. 2014). *See also Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (reversing where "ALJ's credibility finding misstated some important evidence and misunderstood the import of other evidence" and elsewhere "ALJ made a basic factual error"); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (ALJ's findings are not entitled to deference if they are "based on errors of fact or logic").

The ALJ's decision here was based on multiple factual errors, many of which could have been outcome determinative, and therefore, not harmless. Most significantly, the ALJ stated that Plaintiff "had not even seen a neurologist or rheumatologist" before her DLI of September 30, 2014. (R. 21.) But Plaintiff first met with her treating rheumatologist, Dr. Kokebie, on April 30, 2014, to address pain in her shoulder, knees, neck and hands, and she continued to do so over the next several months before her DLI: on June 11, Plaintiff's knee pain was so severe that Dr. Kokebie gave her steroid injections; on August 6, Plaintiff continued to have hand, wrist and bilateral knee pain, and Dr. Kokebie prescribed HCQ, topical analgesics and oxaprozin; and on September 10, Plaintiff told Dr. Kokebie she was still having significant bilateral knee pain. (R. 1008-12.) The ALJ's failure to understand that Plaintiff repeatedly saw a specialist for her pain before her DLI requires remand.

10

Next, the ALJ erroneously stated that a neurological examination soon after the DLI "indicates that [Plaintiff] could likely do light work." (R. 20.)[11] The Court presumes the ALJ was referring to Dr. McGinley's January 2015 examination because that is the only neurological examination the ALJ references in the opinion, and all the other neurologists who examined Plaintiff recommended she undergo surgery to address her severe pain. (*See* R. 492-94 (Dr. Amin in February 2015), R. 2050-53 (Dr. Fontes in May 2015), R. 2723 (Dr. Engelhard performed neck surgery in June 2015).) However, even as to Dr. McGinley's examination, the ALJ's description of it as "indicat[ing] that [Plaintiff] could likely do light work" is simply wrong. Dr. McGinley found Plaintiff's examination "remarkable for mild sensory deficits in fingertips and great toes, along with instability with Romberg, but was otherwise [normal]." (R. 3053-56.). Dr. McGinley did not give any opinion on Plaintiff's functional abilities. To the contrary, Dr. McGinley noted that the "[e]tiology of unsteadiness/dropping things [was] less clear at [that] time, but include[d] orthopedics problems (ex knee pain) combined with previous carpal tunnel . . . most likely, but [] underlying cervical disc disease [was] also possible." (*Id.*) No reasonable person could read Dr. McGinley's report as opining that Plaintiff could likely do light work. *See*, *e.g.*, *Hardy v. Berryhill*, 908 F.3d 309, 312 (7th Cir. 2018) (reversing ALJ decision where ALJ stated that physician's notes reflected "'essentially normal physical exams,' but it is not clear from her discussion what exams she is relying on to make that determination," and "it is not clear how these findings undermine [Plaintiff's] claim of disability").

### III. The ALJ's Decision Mischaracterized Evidence

The ALJ's decision also contains potentially outcome-determinative mischaracterizations of the evidence. Where "the ALJ's description [of the claimant's symptoms] conflicts with many

---

[11] "Medical evidence from after the alleged disability period is relevant to the extent it may reflect the claimant's impairments on a prior date." *Jones v. Saul*, 823 F. App'x 434, 439 (7th Cir. 2020).

11

other treatment notes" and the ALJ's conclusions are "contrary to the evidentiary record," remand is required. *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018). Here, the ALJ stated that Plaintiff had "significant improvement in bilateral knee pain with injections" and "reported walking with much less pain" (R. 22), but these statements conflict with the evidentiary record. The record shows that on October 6, 2014, Plaintiff's physical therapist noted she had limited knee flexion and extension and tenderness to palpation, and that she showed "*mild improvement* in bilateral knee pain through 6 therapy sessions." (R. 368 (emphasis added).) A few days later, Plaintiff canceled a PT session because she was having trouble walking and standing due to knee pain. (*Id*.) Even when she reported "improved" bilateral knee pain on October 15, Plaintiff continued to rate her pain as a seven out of 10 and reported difficulty walking and standing. (R. 362.) Furthermore, Plaintiff told Dr. Kokebie she was only "doing *a little better*" after knee injections. (R. 1007 (emphasis added).)

In addition, the ALJ's description of Plaintiff as experiencing "significant" improvement in her pain contradicts the evidentiary record as a whole because "the medical records actually show that [] treatments were ineffective at either consistently or decisively improving [Plaintiff's] chronic pain or resolving [her] functional limitations." *Lambert*, 896 F.3d at 777. *See also Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (Plaintiff's "unchanged diagnoses and the medication adjustments belie the conclusion that [the claimant's condition] had improved"); *Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020) (reversing and remanding where ALJ failed to acknowledge that claimant continued to report pain despite "progress" in PT); *Baldwin v. Berryhill*, 746 F. App'x 580, 584 (7th Cir. 2018) ("intermittent relief" does not show that a claimant is able to work). Indeed, non-surgical treatment failed; Plaintiff ultimately underwent neck surgery, bilateral knee surgery, lumbar surgery and carpal tunnel surgery.

The ALJ opinion also misleadingly stated that Plaintiff "report[ed] no high level pain," because she rated her pain as two to six on a 10 point scale. (R. 21.) However, the ALJ points to nothing relevant to support this characterization of Plaintiff's pain, citing only to a December 2017 report after surgery on Plaintiff's hand, while the evidence from 2014 and 2015 paints a different picture, with Plaintiff complaining of pain at a level of six or above. *See Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (reversing and remanding where ALJ cited "irrelevant" treatment records to support her determination that claimant's pain was not as limiting as he alleged).

## IV. The ALJ's Decision Cherry-Picked Evidence

It is also well-settled that the Court cannot uphold an ALJ determination that "ignores entire swaths of [evidence] that point toward a finding of disability." *Lothridge v. Saul*, 984 F.3d 1227, 1233-34 (7th Cir. 2021). Put another way, an ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Reinaas*, 953 F.3d at 466. The ALJ's opinion contains numerous instances of this.

First, the ALJ found it noteworthy that Plaintiff did not see a neurologist until after her DLI, but the ALJ overlooked the fact that Plaintiff saw multiple other specialists before the DLI in an attempt to diagnose and treat her pain symptoms and functional limitations. After her rheumatologist, Dr. Kokebie, tried multiple unsuccessful treatments, Plaintiff sought treatment with Dr. McAsey, an orthopedic surgeon, at the end of September 2014, and he attempted to treat her pain with steroid injections. (R. 453-54.) In addition, throughout September and October 2014, Plaintiff received PT in an attempt to ease her pain and functional limitations.

Second, the ALJ emphasized that Plaintiff's physical examinations in 2014 "showed crepitus but full range of motion of all joints" (R. 20), but the ALJ ignored the fact that despite Plaintiff's full ROM, both Plaintiff's treating rheumatologist and orthopedic surgeon during that

13

time continued to try different methods to treat her pain, including different medications, topical analgesics, PT, and steroid injections. "[N]one of [Plaintiff's] physicians interpreted the[] medical findings as inconsistent with [her] reports of recurrent and worsening pain and functional limitations. . . . [They] continued to treat [her] pain." *Lambert*, 896 F.3d at 777. *See Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020) (reversing and remanding where ALJ "made much of the fact" that claimant walked without a limp during her doctor's appointment while discounting fact that the doctor's report was "replete with other findings" showing the claimant had pain and physical limitations). Indeed, one year later, despite having full ROM in her knees, Plaintiff underwent bilateral knee surgery. The ALJ's decision to emphasize Plaintiff's knee ROM while ignoring the significant treatment she continued to receive for her knee pain requires remand.

Third, the ALJ ignored certain evidence of Plaintiff's hand and wrist pain and associated functional limitations. Although the ALJ acknowledged that Plaintiff underwent carpal tunnel surgery right before her alleged onset date, the ALJ discounted this fact because an EMG of her upper extremities in June 2017 – seemingly irrelevant almost three years after her DLI -- was normal. (R. 18.) In doing so, the ALJ ignored abundant evidence of Plaintiff's hand trouble, including her complaints in November 2012 (one month after she underwent left carpal tunnel surgery) of tingling, numbness and pain in her right hand and her repeated complaints to her rheumatologist of hand and wrist pain from April through September 2014. The ALJ also dismissed Plaintiff's complaints about starting to drop things near her DLI because "there is no new diagnosis at this point." (R. 21-22.) "[B]ut an ALJ may not discredit pain complaints solely because they lack objective corroboration." *Lambert*, 896 F.3d at 778.

Fourth, the ALJ cherrypicked evidence of Plaintiff's back and neck impairments. With regard to her lumbar impairments, the ALJ acknowledged that Plaintiff underwent back surgery

14

but found "the medical records documented no functional limitations from her past surgery." (R. 18.) It is unclear what "past surgery" the ALJ is referring to here, because the ALJ cites to lumbar surgery Plaintiff underwent in November 2016. Regardless, the ALJ overlooked the February 2015 MRI of Plaintiff's lumbar spine showing moderate to severe impairment (R. 503-05) and a neurosurgeon's recommendation of lumbar surgery in May 2015 (R. 2050-53). With regard to Plaintiff's neck impairments, the ALJ stated that "MRI of the cervical spine does show some issues, but there was no EMG at that point." (R. 18.) But it is unclear what relevance the absence of an EMG had, since Plaintiff told Dr. Kokebie of pain in her neck as early as April 2014 (R. 1012), Plaintiff complained of radiating neck pain to Dr. McGinley in January 2015 (R. 3053), the February 2015 MRI of Plaintiff's cervical spine showed severe central spinal stenosis (R. 503-05), and neurosurgeons began recommending Plaintiff undergo neck surgery as early as February 23, 2015, less than five months after her DLI. (R. 492-94.) The ALJ's reliance on irrelevant evidence in the face of abundant evidence of Plaintiff's back pain was reversible error.

**V.      Credibility**

The ALJ also erred in finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not supported by the medical records." (R. 21.) This is "the rare case in which the claimant can overcome the 'considerable deference' we afford [the ALJ's credibility] findings unless they are 'patently wrong.'" *Ray*, 915 F.3d at 490.

First, the ALJ erred in drawing an adverse inference based on the absence of treatment records between January and June 2013. "[A]n ALJ must not draw inferences about a claimant's lack of treatment without exploring the reasons for the inaction." *Id.* at 490-91 (reversing where the ALJ "did not ask [the claimant] about his missed spine appointment and instead assumed that he did not attend because his symptoms were not serious"). The record does not show why there

15

are no treatment records between January and June 2013, and the ALJ chose not to ask Plaintiff about this gap at her hearing. The ALJ's decision to draw a negative inference against Plaintiff based on the lack of treatment without exploring the reasons for it was "reversible error." *Id*.

Second, the ALJ erroneously evaluated Plaintiff's daily activities. Despite acknowledging Plaintiff's testimony that she had to take breaks doing housework and cooking due to pain in her neck, back, hands and knees (R. 19), the ALJ determined that Plaintiff "has purported performing a good range of activities of daily living" because "in a function report, she reported that she did laundry, dishes, and housework." (R. 22, citing R. 213.) But the ALJ ignored the limitations Plaintiff included in that function report: "little laundry. Do little dishes. As much as I can house work." (R. 213.) Plaintiff's "ability to do limited work . . . does not adequately support the ALJ's conclusion that [s]he would be able to work full time." *Reinaas*, 953 F.3d at 467 (holding that the ALJ erred in relying too heavily on the claimant's daily activities but "ignor[ing] his testimony about the pain and fatigue these activities cause him and his limitations with them"). *See also Beardsley*, 758 F.3d at 838-39 (holding that ALJ relied too heavily on claimant's ability to clean and do laundry as a basis for finding she could do full time work because the claimant explained that those chores caused her pain and took a long time for her to accomplish).

Third, the ALJ erroneously evaluated Plaintiff's symptoms and limitations from pain. As explained above, the ALJ here, like the ALJ in *Ray*, acknowledged that Plaintiff had severe impairments, but "to support her determination that these impairments are not as limiting as [s]he alleged, she cited irrelevant records from treatment [Plaintiff] received" for other ailments. *Ray*, 915 F.3d at 490. For example, the ALJ relied on evidence from more than three years after Plaintiff's DLI -- a post-operative report on hand surgery and the fact that Plaintiff "popped up out

16

of her chair" at her hearing -- to discount Plaintiff's allegations of pain and difficulty walking and standing before her DLI. (R. 21-22.)

Third, the ALJ erred by failing to consider that Plaintiff's pain and limitations were consistent with medical imaging and the extensive treatment she underwent, including carpal tunnel surgery, multiple knee replacement surgeries, cervical and lumbar fusion surgeries, steroid injections and strong prescription medications. These "painful and risky procedures in attempts to alleviate [her] pain . . . would seem to support the credibility of [her] claims regarding the severity of [her] pain." *Lambert*, 896 F.3d at 778 (quoting *Israel v. Colvin*, 840 F.3d 432, 441 (7th Cir. 2016).). The ALJ's failure to consider the consistency of Plaintiff's allegations of pain with the procedures she underwent requires remand.[12] *See Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (holding that the ALJ's "unsupported credibility assessment provides by itself sufficient reason to remand" where the ALJ also did not address the fact that the claimant's "allegations of pain were consistent with the strong prescription pain medication he was taking").

## CONCLUSION

For the foregoing reasons, the ALJ's opinion was not supported by substantial evidence. Thus, the Court grants Plaintiff's motion for remand (D.E. 19) and denies the Commissioner's motion to affirm. (D.E. 27.)

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: January 11, 2022**

---

[12] The Court finds less persuasive, and declines to reach, Plaintiff's arguments regarding the opinion of a physical therapist who treated her in 2017. (Pl.'s Mem. at 10-11.)